## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

**ROBERT E. MORRISETTE, JR.,**

      **Plaintiff,**

v.                                                                 Civil Action No. 2:15cv199

**MDV SPARTANNASH, LLC,**

      **Defendant.**

## <u>MEMORANDUM OPINION & ORDER</u>

This disability discrimination and retaliation case is before the court on Defendant MDV SpartanNash, LLC's ("Defendant" or "SpartanNash") Motion for Summary Judgment. (ECF No. 19). SpartanNash contends that it is entitled to judgment against Plaintiff Robert E. Morrisette, Jr., ("Plaintiff" or "Morrisette") because the company did not discriminate against Morrisette by failing to accommodate his disability and did not retaliate against him after he filed a lawsuit against the company. Morrisette argues that genuine disputes of material fact – principally concerning the company's knowledge of his medical condition, his pending employment claims, and previous accommodation of other truck drivers – preclude summary judgment on both claims. For the reasons outlined below, the court agrees with Morrisette and DENIES Defendant SpartanNash's Motion.[1]

---

[1] The parties previously entered their consent to proceed before a United States Magistrate Judge, and all further proceedings in the case were referred in accordance with 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.

## I.   UNDISPUTED MATERIAL FACTS[2]

Plaintiff Morrisette is currently, and was during the time period relevant to this suit, employed as a truck driver with Defendant SpartanNash, a food distribution company that primarily serves military commissaries.  Decl. of Michael Digioia ¶¶ 3-4 (ECF No. 20-1, at 1). In 2010, Morrisette was diagnosed with pituitary adenoma, which involves growth in the pituitary gland, and he also learned he had a pineal cyst.  Dep. of Robert Morrisette (ECF No. 20-2, at 2).  These growths are benign, but can cause vision loss and headaches.  Dep. of Dr. Joesph Aloi (ECF No. 20-3, at 4).  Dr. Joseph Aloi ("Dr. Aloi") was Morrisette's treating endocrinologist, id. at 3-4, and in February 2011, Dr. Aloi, on behalf of Morrisette, submitted Family and Medical Leave Act ("FLMA") documentation to SpartanNash.  (ECF No. 20-5).  In this February 2011 paperwork, Dr. Aloi stated that Morrisette had "[f]requent headaches, fatigue, [and] intermittent nausea," and with regard to Morrisette's work, Dr. Aloi noted that "it may be very difficult for him to work overtime."  Id. at 2-3.

In January 2012, Dr. Aloi submitted additional FLMA paperwork, stating that Morrisette "has frequent headaches (some severe), fatigue, [and] intermittent nausea and vomiting."  (ECF No. 20-6, at 2).  Dr. Aloi also stated that "[i]f headache is severe causes vomiting," and "[it is] very difficult for pt [patient] to work more than 10 hours per day due to severe fatigue."  Id. at 3. In January 2013, Dr. Aloi submitted FLMA paperwork with essentially the same description of Morrisette's condition and work restrictions as the January 2012 paperwork.  (ECF No. 20-7, at 2-3).  Dr. Aloi again submitted FLMA paperwork in January 2014, noting that Morrisette "[h]as frequent headaches (severe), fatigue, intermittent nausea, [and] extreme fatigue when driving for

---

[2] Pursuant to Local Civil Rule 56, these facts are established by the movant's list of material facts that it contends are not in dispute, as well as the nonmoving party's list of undisputed facts and exhibits in the record.  E.D. Va. Local Civil R. 56 (stating that unless "a fact is controverted in the statement of genuine issues filed in opposition to the motion," the moving party's listing of material facts is admitted); (ECF Nos. 20, 22, 23).

prolonged periods." (ECF No. 20-8, at 3). Dr. Aloi stated that "[i]f headache is severe and causes vomiting.... Very difficult for pt [patient] to work more than 8-10 hours per day due to severe fatigue." Id. at 4.

From July 2012 to March 2015, Michael Digioia ("Digioia") worked as SpartanNash's Transportation Manager, and in this position, he supervised the drivers in Norfolk, Virginia, including Morrisette. Digioia Decl. ¶¶ 3-4 (ECF No. 20-1, at 1). On March 27, 2015, Guy Gross became the Transportation Manager at SpartanNash, and he currently supervises Morrisette and the other Norfolk drivers. Decl. of Guy Gross ¶ 3 (ECF No. 20-4, at 1). During the time period relevant to this suit, Sam Tramatan served as Regional Director at SpartanNash. Id.

Morrisette and the other drivers at SpartanNash operate under a collective bargaining agreement ("CBA") with the Teamsters, effective April 28, 2013, to April 23, 2016. Id. ¶ 4; see also CBA Agreement (ECF No. 20-4, at 4-45). Under the CBA, drivers have the opportunity to bid for different driving routes based on seniority. Gross Decl. ¶ 5 (ECF No. 20-4, at 1); CBA Agreement (ECF No. 20-4, at 36). Master bids, which determine the driving schedule for a set period of time, occur at least once annually, and two weeks prior to a master bid, the company posts notice of the upcoming bid opportunity. (ECF No. 20-4, at 36). Each bid opportunity includes "a set of runs that establish a work load for a week with certain set runs." Gross Decl. ¶ 5 (ECF No. 20-4, at 1). These "runs" include routes to military commissaries within the region, ports that service overseas commissaries, or "for hire" runs to other vendor locations. Id. The length of each run varies. Runs to bases are usually within two hours of the distribution center, but can be up to five hours away, and runs to ports, such as Norfolk, Virginia, and Portsmouth, Virginia, are typically within one hour of the distribution center. Id. ¶ 6 (ECF No. 20-4, at 2). "For hire" runs vary in length from one to three days. Id. When creating the various runs,

3

SpartanNash seeks to "create bid sets that will result in the most efficient use of equipment, drive time and fuel." Id. ¶ 5. To determine the most efficient route, SpartanNash considers the "locations of the commissaries, distance and routes between the commissaries, volume of goods to each commissary, how often replenishment is needed to the goods, available back hauls, and seasonality of goods." Id. ¶ 6. After the bidding process ends and the runs are filled, the bids are placed on the master schedule. (ECF No. 20-4, at 36). In addition to the master schedule, SpartanNash uses an "extra board which has the postings of extra runs that are not part of the master schedule." Digioia Decl. ¶ 5 (ECF No. 20-1, at 1). The runs on the extra board are dependent on customer needs. Id. As part of the bidding process, there is also one bid package in which the driver takes only runs from the extra board, but generally selects these runs before other drivers. Id.

In December 2013, SpartanNash posted bid opportunities for a new master schedule, which was scheduled to begin in January 2014. Id. ¶ 6 (ECF No. 20-1, at 2). There were a variety of bid opportunities, including extra board bids. Morrisette Dep. (ECF No. 20-2, at 25). Morrisette bid on, and was awarded, a package with four port runs and a Saturday run to Fort Bragg. Digioia Decl. ¶ 6 (ECF No. 20-1, at 2). The Fort Bragg run required a longer trip than the port runs, and when Morrisette bid on this package he knew that he could not do the Fort Bragg run due to his medical condition. Morrisette Dep. (ECF No. 20-2, at 18) ("Am I correct that at the time you bid it and received that run, you knew you couldn't do a Fort Bragg run; is that fair?" "That's fair."). Instead of performing the Fort Bragg runs, Morrisette offered his Fort Bragg runs to other drivers. Digioia Decl. ¶ 7 (ECF No. 20-1, at 2). Morrisette believed he could find other drivers to perform the Fort Bragg run, and thought he would be able to select a run from the extra board that he could perform within his limitations. Morrisette Dep. (ECF No.

22-1, at 4-5). When Digioia learned that Morrisette did not intend to perform the Saturday runs to Fort Bragg, he terminated Morrisette's performance of the bid entirely and placed him at the bottom of the extra board until the next bid opportunity. Digioia Decl. ¶ 8 (ECF No. 20-1, at 2). During this period, Morrisette bid runs on the extra board that he was able to perform, but his position at the bottom of the board led to less desirable runs, and he was not earning as much as he earned performing the bid runs. Morrisette Dep. (ECF No. 20-2, at 9-10). In April 2014, a new bid occurred, and Morrisette bid the extra board run. Digioia Decl. ¶ 8 (ECF No. 20-1, at 2). After Morrisette bid the extra board run in April 2014, he continued to perform runs within his limitations from the extra board until May 2015. Gross Decl. ¶ 7 (ECF No. 20-4, at 2). The vast majority of these runs consisted of port runs. Id.

In May 2015, a new bid occurred, and Morrisette bid on, and was awarded, a bid with port runs only, which provided Morrisette with a regular schedule of runs he could perform within his limitations. Id. ¶ 8. On July 30, 2015, SpartanNash sent a letter informing drivers that the company planned to reduce the number of port drivers from ten drivers to seven drivers. July 30, 2015, Letter (ECF No. 20-4, at 48). The reduction affected Morrisette and two other drivers. Morrisette Dep. (ECF No. 20-2, at 7). The remaining seven port drivers were all senior to Morrisette, but Morrisette was the senior-most driver of the three drivers whose port run positions were eliminated. Id. at 8. After SpartanNash reduced the number of port drivers, Morrisette was placed back on the extra board, and presently bids runs off the extra board that work with his restrictions. Id. at 9-10. When bidding on runs on the extra board, Morrisette is currently the fourth most senior driver, meaning there are three employees on the extra board who are more senior than Morrisette. Id. at 3-4. As a result of losing his bid of regular port runs, Morrisette has a less desirable schedule and earns less income. Id. (discussing the limited

5

availability of runs on the extra board that accommodate Morrisette's medical condition).

## II.  GENUINELY DISPUTED MATERIAL FACTS

In addition to the foregoing undisputed facts, the parties have introduced exhibits and testimony that raise disputes of material fact.  Morrisette argues that these genuine disputes of material fact preclude summary judgment on either of his claims because they relate to SpartanNash's rationale for removing Morrisette from his December 2013 bid and the company's decision to reduce the number of port drivers.  The court recites each party's position with appropriate citation.

## A.  Whether Morrisette's Removal From His December 2013 Bid and Placement on the Extra Board Was Discriminatory, or Denied Him a Reasonable Accommodation.

Morrisette's position is that his removal from his December 2013 bid was due to his disability, and the company's failure to provide a comparable alternative route constituted a failure to accommodate his medical condition.  Specifically, Morrisette states that SpartanNash knew he had "a pituitary problem that 'cause[d] him to have frequent severe headaches and fatigue' that precluded him from working 'any extra hours,' " and knew he had difficulty working "more than 10 hours per day." Pl.'s Br. (ECF No. 22, at 2) (citing Jan. 7, 2011, Letter (ECF No. 22-10, at 3); 2012 FLMA Paperwork (ECF No. 20-6); 2013 FLMA Paperwork (ECF No. 20-7)).  He asserts that the company knew he would not be able to perform the Fort Bragg run when he bid on the package in December 2013 because SpartanNash's own calculations indicated that the Fort Bragg run – which was to be completed on Saturdays – required more than ten hours of work and was therefore outside the range permitted by Morrisette's medical condition. Id. at 3.  And, when Morrisette asked for an accommodation for "that Saturday" by asking "to put the Bragg [run] to the extra board and [to] let [him] choose on the extra board as

6

far as local[ ] [runs]," his position is that the company denied this request, terminated his previously awarded bid package, and placed him at the bottom of the extra board. Morrisette Dep. (ECF No. 22-1, at 4-5). He asserts that other non-disabled drivers were permitted to maintain their bids despite being unable to complete required runs that were a part of their bid packages. He also claims shop rules related to interpretation of the CBA did not prohibit run swaps. (ECF No. 22, at 3) (citing Morrisette Dep. (ECF No. 22-1, at 7-8); Digioia Dep. (ECF No. 22-2, at 5-12)). As a result, he claims both direct discrimination and a failure to accommodate his medical condition.

In contrast, SpartanNash's position is that before Morrisette bid on the package, he did not inform the company that his medical condition would prevent him from performing the Fort Bragg run, and he did not ask for an accommodation. Digioia Decl. ¶ 6 (ECF No. 20-1, at 2). SpartanNash also asserts that contrary to the company's policy, Morrisette offered his Fort Bragg run to other drivers without informing Digioia or the dispatcher. Id. ¶ 7. Because Morrisette was unable to perform part of his bid package, the company's position is that "Digioia deemed Morrisette to have declined to perform his bid" and for this reason, removed him from the bid package and placed him at the bottom of the extra board until the next bid. Def.'s Br. (ECF No. 20, at 7). The company also distinguishes the non-disabled drivers who were allowed to keep their bids, claiming the other drivers did not enter into the bid process intending to permanently reassign portions of the bid package to other drivers. Def.'s Reply Br. (ECF No. 23, at 7).

**B.     SpartanNash's Knowledge About Morrisette's Pending Lawsuit as a Basis for Retaliation.**

With regard to Morrisette's claim that SpartanNash retaliated against him by reducing the number of port drivers, SpartanNash asserts that the company reduced the number of port drivers

for legitimate business reasons.  Specifically, the company states that prior to July 2015, SpartanNash dispatched its port work out of the company's Village Avenue facility.  Dep. of Guy Gross (ECF No. 20-15, at 2).  In July 2015, Regional Director Sam Tramatan transferred all dispatch work to the Kingwood Avenue facility in order "have a better eye on it."  Id. at 2-3. After transferring the dispatch work, "management noticed flaws in the process," including "an incredible amount of delay time between runs as drivers were getting paid ... [to] wait[ ] for their next load to take to the ports."  Gross Decl. ¶ 10 (ECF No. 20-4, at 2).  SpartanNash determined that it "could take the same number of containers to the port with less drivers," and therefore reduced the number of port drivers from ten to seven, placing the three most junior drivers on the extra board.  Id. ¶¶ 10-11.  Morrisette was the eighth driver in seniority, and thus his port-run bid was the last to be cancelled.

The company also claims that the decision-maker who eliminated Morrisette's port-run bid did not know about his lawsuit, and therefore could not have retaliated against him because of it.  In his declaration, Gross, SpartanNash's Transportation Manager, states that when "[he] drafted a letter to all drivers informing them that the number of port drivers was being reduced from 10 to 7 ... [he] had no idea that Mr. Morrisette had filed a lawsuit in federal court against SpartanNash."  Id. ¶ 11.

Morrisette contests SpartanNash's characterization of the reduction in drivers.  He states that SpartanNash reduced the number of port drivers less than sixty days after a new bid started on May 10, 2015.  Pl.'s Br. (ECF No. 22, at 4) (citing Gross Dep. (ECF No. 20-4, at 6)).  He has also produced evidence to suggest that any reduction in port runs came after the company had made the decision to reduce the number of drivers used, and that the reduction in runs was substantially less – as a percentage – than the reduction in drivers.  Id. at 14-15 (discussing the

decline in port runs versus the elimination of drivers). Finally, Morrisette asserts that Gross's statement in his declaration contradicts his deposition testimony regarding his knowledge of Morrisette's lawsuit against SpartanNash. Id. at 4. That is, in his declaration, Gross states that he did not know about the pending lawsuit, but in his deposition, he stated that in June 2015 he "heard [Morrisette] filed a lawsuit." Id. (citing Gross Decl. ¶ 11 (ECF No. 3); Gross Dep. (ECF No. 20-4, at 6)).

### III.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986). "A material fact is one 'that might affect the outcome of the suit under the governing law.' A disputed fact presents a genuine issue 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.' " Spriggs v. Diamond Auto Glass, 242 F.3d 179, 183 (4th Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

The party seeking summary judgment has the initial burden of informing the court of the basis of its motion and identifying materials in the record it believes demonstrates the absence of a genuine dispute of material fact. Fed. R. Civ. P. 56(c); Celotex Corp., 477 U.S. at 322-25. When the moving party has met its burden to show that the evidence is insufficient to support the nonmoving party's case, the burden shifts to the nonmoving party to present specific facts demonstrating that there is a genuine issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). The "mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient." Anderson, 477 U.S. at 252. Rather, when "the

record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (internal quotation marks omitted).

In considering a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); see Anderson, 477 U.S. at 255. That is, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

## IV.   ANALYSIS

### A.   Disputes of Material Fact Preclude Summary Judgment on Morrisette's Claim of Discrimination and Failure to Accommodate.

Morrisette first claims that SpartanNash discriminated against him because of his disability when it learned he was arranging for other drivers to perform his Fort Bragg run and terminated his bid, placing him at the bottom of the extra board. To prove a claim of disability discrimination under the Americans with Disabilities Act ("ADA"), a Plaintiff must introduce evidence (1) that he has a disability; (2) that he is a qualified individual for the employment in question; and (3) that he was subject to adverse employment action because of his disability. Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 572 (4th Cir. 2015). A discrimination claim may be proven through direct or indirect evidence, or using the McDonnell Douglas framework. See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under this framework, the Plaintiff must first satisfy an initial burden by presenting evidence to establish a prima facie case of discrimination, and the burden then shifts to the employer to articulate a

legitimate, nondiscriminatory reason for the adverse employment action. See Raytheon Co. v. Hernandez, 540 U.S. 44, 49 n.3, 49-50 (2003). Once the employer offers a legitimate nondiscriminatory reason for the action, the burden shifts back to the Plaintiff to prove that the employer's asserted reasons are pretextual. Jacobs, 780 F.3d at 575-76; Ennis v. Nat'l. Ass'n. of Bus. & Educ. Radio, Inc., 53 F.3d 55, 58 (4th Cir. 1995).

At this stage of the proceedings, it is not necessary to decide whether Morrisette has sufficient direct evidence of disparate treatment, because under the McDonnell Douglas framework, he has presented sufficient evidence to create a dispute of material fact precluding summary judgment. Here, Morrisette has met his burden to prove a prima facie case by offering proof that his bid was terminated, and that he was placed at the bottom of the extra board because he could not complete his Fort Bragg runs. He has also introduced evidence that he could not complete the long runs due to his disability. SpartanNash, however, claims that Morrisette was moved to the extra board because he made the bid knowing that he could not completely perform it, and that the company's CBA prohibited the individual parsing of bids, which Morrisette had tried to do. This legitimate nondiscriminatory basis for the change is sufficient to rebut the charge of discrimination. But Morrisette has also produced sufficient evidence from which reasonable jurors could conclude that the employer's proffered rationale was pretextual, and that his bid was terminated as a result of his disability. Specifically, Morrisette identified two other drivers who had chosen bids they did not fully perform, but did not have their bids terminated. He also identified documents suggesting the CBA did not explicitly prohibit run swapping.

Morrisette identified Johnny Reed and Anthony Coleman as two other drivers who were permitted to maintain their bids despite their inability to perform all of the runs they included.

11

Although the company offers distinguishing characteristics with respect to both drivers, it has not disputed Morrisette's underlying claim that both were permitted to maintain their bids while other drivers performed scheduled runs that were part of those bids. Specifically, Reed solicited other drivers to perform the Fort Bragg runs that were a portion of his bid for a period of at least seven weeks. The company has not really contested the records of Reed's run swapping. It speculates that SpartanNash may have exercised its right to re-allocate drivers to meet emergent customer needs, but ultimately does not dispute Morrisette's claim that Reed was permitted to maintain his bid despite repeatedly giving up the Fort Bragg run to other drivers. Similarly, Coleman was unable to perform port runs associated with his bid as a result of a delay in obtaining an appropriate clearance, but was permitted to retain his bid. Again, SpartanNash does not dispute that the port clearance prevented Coleman from performing his runs, but points out that the clearance issue was expected to be resolved promptly, and was extended because of an unexpected delay in the agency processing his request. While the jury may well agree that these differences place Coleman and Reed in a different category, Morrisette may nonetheless rely on these similarly situated drivers to meet his burden on summary judgment.

Finally, Morrisette also offered evidence that the rule prohibiting drivers from switching routes was implemented after Morrisette's bid was terminated and prior to the rebid of jobs in April 2014. Digioia Dep. (ECF No. 22-2, at 19-20); Ex. 17 (ECF No. 22-3, at 1). As a result, Morrisette has established evidence sufficient to create a dispute of material fact regarding the company's decision to cancel his bid and transfer him to the bottom of the extra board.

Morrisette also claims he was discriminated against when SpartanNash failed to reasonably accommodate his disability with a more flexible driving schedule. See 42 U.S.C. § 12112(b)(5)(A)-(B). To establish a prima facie case for failure to accommodate, Morrisette must

12

show: "(1) that he was an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position ...; and (4) that the [employer] refused to make such accommodations." Wilson v. Dollar Gen. Corp., 717 F.3d 337, 345 (4th Cir. 2013) (alteration in original).  A reasonable accommodation is one "that enables a qualified individual with a disability ... to perform the essential functions of [a] position." Jacobs, 780 F.3d at 580. An employer may reasonably accommodate an employee without providing the exact accommodation that the employee requested. Reyazuddin v. Montgomery Cty., Md., 789 F.3d 407, 415 (4th Cir. 2015).  But a reasonable accommodation must "provide a meaningful equal employment opportunity ... [meaning] an opportunity ... to attain the same level of performance as is available to nondisabled employees having similar skills and abilities." Id. at 416 (quoting H.R. Rep. No. 101-485, pt. 2, at 66 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 349).

Morrisette's failure to accommodate claim is also directed to the company's initial decision to terminate his bid.  At that time, in January 2014, Morrisette claims he asked if he could be permitted to place his Fort Bragg run on the extra board and drive another run on Saturday within his restrictions.  Morrisette Dep. (ECF No. 22-1, at 4-5).  The company denied this request.  SpartanNash defends its accommodation by pointing to a change that occurred four months later during the rebid process.  But even accepting the company's claims that this rebid allowed Morrisette to receive equivalent work, he has still created a jury issue on whether the company's failure to permit the bid modification denied him reasonable accommodation.  The company defends its initial decision to terminate the bid by arguing that Morrisette's plan to reassign his Fort Bragg run would violate the CBA.  But as discussed above, there is a dispute of fact concerning the company's previous accommodation of such requests, and at least two other

drivers in similar circumstances were permitted to maintain their bids.  At the summary judgment stage, Morrisette must only show that the accommodation he proposed "seems reasonable on its face." U.S. Airways v. Barnett, 535 U.S. 391, 401-02 (2002).  Moreover, the statute specifically anticipates that accommodation may require job restructuring, or modification of work schedules and policies.  42 U.S.C. § 12111(9)(B).

This is not to say that SpartanNash can be forced to accept Morrisette's preferred modification if another accommodation is also reasonable.  "[T]he employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide." Hankins v. The Gap, Inc., 84 F.3d 797, 800 (6th Cir. 1996) (quoting Interpretive Guidance on Title 1 of the Americans with Disabilities Act, 29 C.F.R. pt. 1630, app. at 415 (2014)).  But at this stage of the proceedings, Morrisette's proposed accommodation was "reasonable on its face," and the company's decision to terminate his bid creates a jury issue on reasonable accommodation for that period of time until the rebid occurred.

**B.    Disputes of Material Fact Preclude Summary Judgment on Morrisette's Retaliation Claim.**

In Morrisette's second claim, he asserts that SpartanNash retaliated against him by eliminating his port-run bid after he filed an EEOC charge and present lawsuit against the company.  Am. Compl. ¶¶ 23-26 (ECF No. 11, at 5-6).  Defendant SpartanNash argues that it is entitled to summary judgment on this claim because "Morrisette cannot establish a causal connection between the reduction in the number of port drivers from 10 to 7 and the service of his lawsuit on SpartanNash on July 27, 2015." Def.'s Br. (ECF No. 20, at 18).  Morrisette disputes this, citing evidence that the decision-maker knew about his prior lawsuit. (ECF No. 22,

14

at 13-15). In addition, he claims the reason provided by SpartanNash was simply a pretext. Id.

With regard to retaliation, the ADA states that "no person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). "[T]o prevail on a claim of retaliation, a plaintiff must either offer sufficient direct and indirect evidence of retaliation, or proceed under a burden-shifting method." Jacobs, 780 F.3d at 577 (quoting Rhoads v. FDIC, 257 F.3d 373, 391 (4th Cir. 2001)).  Regardless of "[w]hether a plaintiff proceeds by direct evidence or McDonnell Douglas burden-shifting, [a Plaintiff] must show (i) that she engaged in protected activity and, (ii) because of this, (iii) her employer took an adverse employment action against her." Id.

SpartanNash argues – and Morrisette appears to concede – that there is "no direct evidence of retaliation," and in the absence of direct evidence, the McDonnell Douglas framework applies. (ECF No. 20, at 18) (citing Jacobs, 780 F.3d at 578); (ECF No. 22, at 13-14).  Under the McDonnell Douglas framework, to establish a prima facie case of retaliation, the Plaintiff must show: "(1) that [he] engaged in protected activity; (2) that [his] employer took an adverse action against [him]; and (3) that a causal connection existed between the adverse activity and the protected actions." Jacobs, 780 F.3d at 578 (citing Haulbrook v. Michelin N. Am., 252 F.3d 696, 706 (4th Cir. 2001)).  If the Plaintiff proves these three elements, "[t]he employer then has the burden 'to rebut the presumption of retaliation by articulating a legitimate nonretaliatory reason for its actions.' " Id. (quoting Rhoads, 257 F.3d at 392)).  "The burden then shifts back to the plaintiff to show that the proffered reason is pretext." Id.  In this framework, the Plaintiff "always bears the ultimate burden of persuading the trier of fact that

[he] was the victim of retaliation." Id.; see Staley v. Gruenberg, 575 Fed. Appx. 153, 155 (4th Cir. 2014) (" '[Plaintiff retains] the ultimate burden of persuading the trier of fact,' that her engagement in the protected activities was a 'but for' cause of her non-conversion to permanent status." (citations omitted)).

In the present case, the parties agree that Morrisette is able to show the first two elements of retaliation under the McDonnell Douglas framework.  Specifically, as to the first element, the parties agree that Morrisette engaged in protected activity when he asked for an accommodation for his disability and when he filed his EEOC charge and lawsuit. See (ECF No. 20, at 18-19); (ECF No. 22, at 13-14).  And, with regard to the second element, SpartanNash does not dispute that the company reduced the number of port drivers from ten to seven, resulting in an adverse action against Morrisette because he was one of the three drivers whose regular bid was terminated. See (ECF No. 20, at 19); (ECF No. 22, at 13-15).  However, the parties dispute the third element – causation. That is, SpartanNash argues that Morrisette is not able to show a causal connection between the protected activity and the adverse action.

To establish causation, "[t]emporal proximity between protected activity and the adverse employment action ... [is viewed as] 'highly suspicious' and 'give[s] rise to a strong inference of discrimination.' " Smith v. Strayer Univ. Corp., 79 F. Supp. 3d 591, 605 (E.D. Va. 2015) (quoting Weth v. O'Leary, 796 F. Supp. 2d 766, 782 (E.D. Va. 2011)).  Here, Morrisette filed his present lawsuit against SpartanNash in May 2015, and he perfected service on the company on July 27, 2015. See (ECF No. 1); see also (ECF No. 3).  Three days later, on July 30, 2015, SpartanNash sent a letter notifying all drivers that the company planned to reduce the number of port drivers from ten to seven drivers. (ECF No. 20-4, at 48).  Morrisette was the last of the three drivers whose port runs were eliminated. As stated above, temporal proximity creates a

16

strong inference of discrimination, and here, SpartanNash eliminated Morrisette's port run package within three days of receiving service of his lawsuit. Moreover, although some courts have held that a Plaintiff must show more than temporal proximity to establish causation under the McDonnell Douglas framework, these cases involve employees who, unlike Morrisette, had previously documented work performance issues. See, e.g., Staley, 575 Fed. Appx. at 156 (noting that although the employee's nonconversion to a permanent position occurred shortly after she filed a formal EEOC complaint, "the record reveals that [the employee] was not converted to permanent status because she disregarded ... company policy, was disrespectful to supervisors, and demonstrated poor judgment"); Strayer Univ. Corp., 79 F. Supp. 3d at 605 ("The facts here are undisputed. Plaintiff knew for over a month before she filed her formal request for accommodation that her job was in jeopardy. Her performance did not improve during this period of time. She even considered herself an ineffective employee. Based on these undisputed facts, Plaintiff cannot establish the causal connection necessary between her request for accommodation and her termination."). Accordingly, the court finds that in Morrisette's case, the close temporal proximity between the protected activity and adverse activity establishes a disputed issue of fact as to causation, and a reasonable jury could conclude that Morrisette has established a prima facie case of retaliation.

Under the McDonnell Douglas burden-shifting framework, the court next assesses whether SpartanNash is able to rebut this presumption of retaliation by articulating a legitimate nonretaliatory reason for its actions. See Jacobs, 780 F.3d at 578 (citing McDonnell Douglas Corp., 411 U.S. 792). SpartanNash first claims that the company could not have retaliated against Morrisette because the decision-makers did not know that Morrisette had filed a lawsuit against the company. See (ECF No. 20, at 18-19). Morrisette disputes SpartanNash's claim that

17

the decision-makers did not know about his lawsuit, and from the evidence presented by Morrisette, the court finds that reasonable jurors could determine that the decision-makers were aware of Morrisette's suit before terminating his port-run bid package. See Gross Decl. ¶ 11 (ECF No. 20-4, at 3); Gross Dep. (ECF No. 20-4, at 6). SpartanNash's second explanation is that the company reduced the number of port drivers for economic reasons, citing a decline in the number of port runs performed by the company. See Def.'s Reply Br. (ECF No. 23, at 14-16) (citing (ECF No. 20-4, at 46-47)). Although the company has stated a possible legitimate nonretaliatory reason for the reduction in port drivers, the court finds that reasonable jurors could conclude that SpartanNash's proffered economic rationale was pretextual. Specifically, Morrisette presents evidence suggesting that the company decided to reduce the number of drivers used before it had suffered any decline in the number port runs. See (ECF No. 22, at 15) (citing Exhibit B attached to Gross's Declaration (ECF No. 20-4, at 48)). Morrisette also argues that the reduction in runs was substantially less – as a percentage – than the reduction in drivers. Id. Because Morrisette was eighth in seniority, an economically driven reduction from 10 to 9 or 8 port drivers would not have affected him. The court therefore finds that Morrisette has presented sufficient evidence of pretext such that a reasonable jury could conclude that SpartanNash retaliated against Morrisette in deciding to eliminate his fixed bid of port runs.

Because the court finds that a reasonable jury could conclude that Morrisette has established a prima facie claim of retaliation and presented sufficient evidence of pretext, the court finds that genuine disputes of material fact preclude summary judgment on this claim.

## V.    **CONCLUSION**

For the foregoing reasons, the court DENIES Defendant SpartanNash's Motion for Summary Judgment (ECF No. 19).

IT IS SO ORDERED.

_____ /s/
Douglas E. Miller
United States Magistrate Judge

_____
DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
August __, 2016

19